UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**Dow Electric, Inc.,**

                        **Plaintiff**

                        v.                                       7:03-CV-689
                                                               (FJS/DEP)

**International Brotherhood of Electrical
Workers, Local Union No. 910,**

                        **Defendant.**
_____

| **APPEARANCES** | **OF COUNSEL** |
|---|---|
| **HISCOCK & BARCLAY, LLP**<br>One Park Place<br>300 South State Street<br>Syracuse, New York 13202-2078<br>Attorneys for Plaintiff | **ALAN R. PETERMAN, ESQ.**<br>**ROBERT P. HEARY, ESQ.** |
| **BLITMAN & KING LLP**<br>Franklin Center<br>443 North Franklin Street<br>Suite 300<br>Syracuse, New York 13204-1415<br>Attorneys for Defendant | **KENNETH L. WAGNER, ESQ.** |

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On October 6, 2004, Plaintiff filed its Amended Complaint asserting four causes of action in an attempt to vacate a Labor-Management Committee's ("Committee") award against Plaintiff for violating a collective bargaining agreement. Defendant asserts a counterclaim that seeks confirmation of the Committee's award. Currently before the Court are Plaintiff's motion and

Defendant's cross-motion for summary judgment. On September 9, 2005, the Court heard oral argument, at which time it reserved decision and requested further briefing regarding the grievance award. On September 16, 2005, Defendant submitted the requested materials in a letter brief with attachments. The following constitutes the Court's written decision regarding these motions.

## II. BACKGROUND[1]

Plaintiff is a privately-owned electrical contractor. In June 1993, Plaintiff contacted Defendant, a union hall, and inquired about hiring skilled electricians. Defendant told Plaintiff that it needed to execute a pre-hire agreement before receiving referrals from the Union Hall. Therefore, on June 23, 1993, Harry Dow, on behalf of Plaintiff, signed three "Letter of Assent-A" pre-hire agreements with Defendant. The three agreements covered inside construction, residential wiring, and maintenance work.

The first paragraph of the Inside Construction Pre-hire Agreement stated that,

> [i]n signing this letter of assent, the undersigned firm does hereby authorize Plattsburgh Division of the Albany Chapter NECA as its collective bargaining representative for all matters contained in or pertaining to the current and any subsequent approved Inside Construction labor agreement between the Plattsburgh Division of the Albany Chapter NECA and Local Union 910 IBEW. In doing so, the undersigned firm agrees to comply with, and be bound by, all of the terms and conditions contained in said current and subsequent approved labor agreements. This authorization, in compliance with the current approved labor agreement, shall become effective on the 25 day of June, 1993. It shall remain in effect until terminated by the undersigned employer giving written notice to the Plattsburgh Division of the Albany Chapter NECA

---

[1] The facts are not in dispute.

> and to the Local Union at least one hundred fifty (150) days prior
> to the then current anniversary date of the applicable labor
> agreement.

*See* Amended Complaint at Exhibit 1a (footnotes omitted). The Residential and Maintenance Work Pre-hire Agreements contained identical first paragraphs except that they provided that the St. Lawrence Valley Electrical Contractors Association ("Association") was the collective bargaining representative and changed the type of covered work. *See id.* at Exhibits 1b and 1c (footnotes omitted). In or around 1993, the Plattsburgh Division of the Albany Chapter NECA delegated its bargaining authority to the Association.

During the course of the 1997-2000 CBAs, the Union referred electricians to work on Plaintiff's projects. However, Plaintiff complained to the Union about the quality of referrals and, ultimately, requested a Labor-Management Committee meeting to discuss these problems. Thereafter, Plaintiff sent essentially identical letters, dated July 31, 1998, to both Defendant and the Association:

> [a]s of August 1, 1998, Dow Electric Inc, is withdrawing its
> membership from the National Electrical Contractors Association
> as well as our agreements with the Local 910. This withdrawal
> includes the Inside Construction Agreement, Maintenance
> Agreement, and Residential Wiring Agreement.
>
> The reason for this decision is based on the bottom line of
> Profit/Loss.
>
> In the past Five plus years we have incurred either a break even or
> loss on most projects in which we have employed Union help.
>
> Most Electricians we have employed are considerable [sic] less
> qualified than than [sic] what we expect of Journeymen
> Electricians [sic]
>
> We have neither the capital nor the time to educate these people

>about responsibilities, workmanship, punctuality and all the other criteria that make up a qualified Electrician that can complete a project on time.
>
>We also feel Local 910 has not supplied Dow Electric Inc. with the special skills people that we requested on numerous occasions (Specifically Capable Supervision) [sic]
>
>We would appreciate your attention in this matter as soon as possible.

*See id.* at Exhibits 2 and 3. However, the 1997-2000 CBAs were not due to expire until March 31, 2000. Therefore, Defendant sent Plaintiff a letter in response, dated August 11, 1998, that stated, in pertinent part, "that due to your untimely request Dow Electric, Inc. is bound to the collective bargaining agreements with Local 910 until March 31, 2000."[2] *See id.* at Exhibit 4 at 1.

Plaintiff's counsel responded, in part, by sending Defendant a letter, dated October 7, 1998, that stated

>I thank you for the opportunity to speak with you on September 29, 1998 about our mutual goal in promoting Harry Dow's success under the collective bargaining agreement. As I promised, we hereby withdraw Harry Dow's letter of July 31, 1998 purporting to withdraw from the Union. We expressly disavow that intent and declare the letter void as to that purpose. To the extent that letter may be effective in withdrawing from the National Electrical Contractors Association, it shall stand.

*See id.* at Exhibit 6. Prior to the 1997-2000 CBAs' expiration on March 31, 2001, Plaintiff's counsel again wrote to Defendant in a letter dated March 29, 2000:

>As the contract between the Union and Dow Electric comes to an end, we wish to thank you for your cooperation over the last

---

[2] The Association sent Plaintiff a letter, dated January 1, 1999, which accepted Plaintiff's resignation and stated that it took effect on August 1, 1998.

> eighteen months.  I think you'll agree that the Company has fulfilled its obligations under the contract.
>
> Nevertheless, you must also be aware that we haven't had any employees for nearly two years.  Moreover, under the holding in the case of *Deklawa and Sons*, 282 NLRB 1385 and the cases interpreting it, Dow Electric is under no further obligation to bargain with the Union for, or enter into, a new collective bargaining agreement.
>
> Since we had not heard from you regarding the Union's intent with respect to a successor agreement (see Section 1.02 of the Agreement) we thought this would be the appropriate time to inform you of our decision.

*See id.* at Exhibit 8.  Defendant subsequently sent Plaintiff a letter, dated April 18, 2000, stating that, pursuant to the pre-hire agreement letters of assent, Plaintiff was bound to a new collective bargaining agreement from April 1, 2000, to March 31, 2003.

On February 20, 2001, Defendant notified Plaintiff that it was conducting an independent audit of Plaintiff's payroll records from March 1999 to the time of the audit.  On March 26, 2001, Defendant informed Plaintiff that it was filing a grievance for violations of the Inside Construction CBA.  Defendant also stated that it was requesting a Labor-Management Committee meeting with the Northern New York Chapter of NECA to address the grievance.  By letter dated April 9, 2001, Defendant informed Plaintiff that the Labor-Management Committee would meet to consider the grievance on April 11, 2001.  Plaintiff responded on April 10, 2001:

> As you know, it [is] our position, one for which there is extensive authority, that since the expiration of the last collective bargaining agreement, Dow Electric is under no further contractual obligation to the union.  This position was explained fully in our letter to you of March 29, 2000.
>
> Moreover, please be re-advised that on July 31, 1998 we contacted the Albany Electrical Contractors Association, Inc. . . . to

> inform them of our intent to withdraw from the association. On October 9, 1998 Albany Electrical Contractors Association, Inc. . . . confirmed in writing that our membership was terminated.
>
> Please do not expect our attendance at the meeting. Should you or your lawyer wish to discuss this any further, I will be happy to talk with either one of you. If you have any questions – questions which you would otherwise have brought up at the meeting tomorrow – I will be happy to address them as well, not in the environment of the LM conference that has no basis in any contractual relationship.

*See id.* at Exhibit 17. Plaintiff did not attend the Committee meeting.

By letter dated July 10, 2001, the Committee informed Plaintiff of the results of its meeting concerning the Union's grievance. The Committee first concluded that Plaintiff "remains a party to and is bound by the Inside Construction Agreement effective April 1, 2000 until March 31, 2003 between Northern New York Chapter of NECA, Inc. and the Union ("Agreement") . . . ." *See id.* at Exhibit 18 at 2. Moreover, the Committee stated that,

> [a]t this time, there is insufficient evidence to rule upon the merits of the Union's allegations of Dow Electric's failing to apply the Agreement to covered work. We do find, however, that in violation of the Agreement Dow Electric has failed and refused to comply with the Union's proper audit request. Pursuant to section 2.19 and 9.08-9.11 of the Agreement, the Union is clearly entitled to audit an employer's payroll records. We therefore order Dow Electric to make available to the Union any and all payroll records for the period March 1999 to the present. We reserve jurisdiction over the grievance to determine the alleged violations upon a proper showing by the Union.

*See id.* On August 17, 2001, in response to Defendant's counsel, Plaintiff's counsel disputed the Committee's conclusion that Plaintiff had refused to comply with Defendant's audit request and further requested that Defendant explain the grounds upon which it and the Committee believed that Plaintiff remained a signatory to the Inside Construction CBA. Consequently, the parties

-6-

exchanged more correspondence in September and October of 2001, setting forth their respective legal positions.

Defendant filed suit against Plaintiff in this Court on June 28, 2001, seeking to enforce the Committee's order that Plaintiff submit to an audit of its payroll records. However, the parties settled the dispute when Plaintiff agreed to submit to an audit. Defendant filed a notice of voluntary dismissal on July 26, 2002.

Following the audit, Defendant's counsel informed Plaintiff that it owed $916,723.49 under the 1997-2000 and 2000-2003 CBAs. By letter dated January 29, 2003, the Committee informed Plaintiff that it would consider the matter at a meeting on February 13, 2003. Plaintiff attended that meeting and asked the Committee to reconsider its determination that the 2000-2003 CBA bound Plaintiff on the ground that Plaintiff had not been informed in advance that the Committee would consider that issue at its previous meeting on April 11, 2001. The Committee denied Plaintiff's request for reconsideration. It also voted unanimously to uphold Defendant's grievance pursuant to several provisions of the 2000-2003 CBA and reserved decision with respect to two such provisions. In a letter dated March 7, 2003, the Committee informed Plaintiff of this result and stated that it would provide the parties with an opportunity to settle. The Committee also stated that either party could apply for a hearing on remedies.

In April 2003, Defendant informed Plaintiff that its accountant would return to Plaintiff's office to update the audit by reviewing records from October 2002 through March 2003. Shortly thereafter, Defendant requested that the Committee convene to consider remedies. At the hearing, Plaintiff stipulated that it was responsible for payment of unpaid fringe benefit contributions for the period ending March 31, 2000, the date that the 1997-2000 CBA expired.

However, in its award dated June 28, 2004, the Committee unanimously decided to award damages totaling $1,054,641.37, in accordance with Defendant's calculations, for both the 1997-2000 and 2000-2003 periods.[3]

### III. DISCUSSION

In its motion for summary judgment, Plaintiff argues (1) that its July 31, 1998 letters were sufficient to terminate the Association's negotiating authority; (2) that its March 29, 2000 letter was sufficient to terminate the collective bargaining relationship alone pursuant to the one-man unit rule; (3) that the Committee did not have jurisdiction to arbitrate the grievance because Plaintiff was not a party to the 2000-2003 CBA; (4) that the Committee engaged in misconduct by failing to reconsider its determination that Plaintiff was a party to the 2000-2003 CBA and refusing to hear Plaintiff's evidence on the issue; and (5) that the 2000-2003 CBA did not authorize the Committee's award of interest, liquidated damages, or back pay.

In its cross-motion for summary judgment, Defendant asserts that (1) Plaintiff's July 31, 1998 and October 7, 1998 letters are equivocal with respect to its intent to withdraw negotiating authority from the Association and, therefore, are ineffective; (2) since Plaintiff did not effectively terminate the Association's negotiating authority, the 2000-2003 CBA binds Plaintiff; (3) pursuant to the 2000-2003 Inside Wiring Agreement, the parties agreed to submit their disputes to the Committee; (4) Plaintiff merely withdrew from membership in the Association,

---

[3] In response to the Court's request at oral argument, Defendant provided a breakdown of the damages award. The damages award consists of $63,011.48, for violations occurring before April 1, 2000, and $991,629.89, for violations occurring between April 1, 2000, and March 31, 2003. The Court notes that there seems to be a discrepancy of one dollar in Defendant's calculations.

which is not sufficient to revoke its delegation of collective bargaining authority; and (5) the Court's review of the Committee's award is limited. In addition, Defendant asserts that Plaintiff cannot assert the one-man unit rule for the first time at this stage of the litigation.

A.   **The Committee's authority to hear the dispute under the 2000-2003 CBA**

Arbitration is a matter of contractual obligation, and a party cannot be required to arbitrate any dispute without having agreed to do so. *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quotation and other citation omitted). Therefore, the question of whether a CBA creates a duty for the parties to arbitrate a particular matter is an issue that the court, rather than the arbitrator, should decide. *See id.* at 649 (citations omitted).

The 1997-2000 Inside Construction Agreement and the 2000-2003 Inside Construction Agreement contained identical arbitration provisions:

> All grievances or questions in dispute shall be adjusted by the duly authorized representatives of each of the parties to this Agreement. In the event that these two are unable to adjust any matter within 48 hours, they shall refer the same to the Labor-Management Committee.

*See* Affidavit of Kenneth L. Wagner ("Wagner Aff."), sworn to June 13, 2005, at Exhibit 6 at § 1.06; *id.* at Exhibit 8 at § 1.06. Therefore, in determining whether the Committee had authority to arbitrate the grievance under the 2000-2003 CBA, the relevant question is whether the 2000-2003 agreement bound Plaintiff. If Plaintiff validly withdrew its consent to the Association's collective bargaining authority prior to the 2000-2003 CBA pursuant to the pre-hire agreements, then the 2000-2003 CBA's arbitration provisions would not have bound Plaintiff.

### *1. Plaintiff's July 31, 1998 letters*

As stated above, on July 31, 1998, Plaintiff sent Defendant and the Association letters stating that,

> [a]s of August 1, 1998, Dow Electric Inc, is withdrawing its membership from the National Electrical Contractors Association as well as our agreements with the Local 910. This withdrawal includes the Inside Construction Agreement, Maintenance Agreement, and Residential Wiring Agreement.

*See* Amended Complaint at Exhibits 2 and 3. The parties do not dispute the content of these letters, but they do dispute their legal effect. Defendant asserts that Plaintiff's intent to withdraw its delegation of collective bargaining authority to the Association is not unequivocal. In support of this assertion, Defendant correctly states that a party's withdrawal of membership in a multi-employer bargaining unit does not necessarily end the unit's bargaining authority on behalf of that party because these relationships are legally distinct. *See Haas Elec., Inc. v. Nat'l Labor Relations Bd.*, 299 F.3d 23, 29 n.7 (1st Cir. 2002) (citation omitted).

In most circumstances, timely written notice is required to withdraw from a multi-employer collective bargaining unit and terminate its collective bargaining authority. *See Road Sprinkler Fitters Local Union No. 669, AFL-CIO v. Simplex Grinnell LP*, 251 F. Supp. 2d 1201, 1205 (W.D.N.Y. 2003) (citing *Retail Associates,* 120 N.L.R.B. at 395) (other citation omitted). The adequacy of the notice depends on its clarity; therefore, the notice of withdrawal must be unequivocal. *See id.* (quotation omitted). Notice is unequivocal if it is "unambiguous." *Haas Elec.*, 299 F.3d at 28 (quotation omitted). "'If the notification causes confusion, it may defeat the effectiveness of the employer's withdrawal.'" *Road Sprinkler Fitters*, 251 F. Supp. 2d at 1205 (quotation and other citations omitted).

-10-

The Court finds that Plaintiff's July 31, 1998 letters unequivocally indicated its intent to terminate the Association's collective bargaining authority for the following reasons. First, the letters explicitly state that, in addition to resigning membership in the multi-employer bargaining unit, Plaintiff also withdrew from its agreements with Defendant. Although the letters do not specifically reference the pre-hire agreements, in which Plaintiff and Defendant agreed that Plaintiff authorized the Association to be its collective bargaining agent, they are broad enough to include all agreements with Defendant. The pre-hire agreements were "agreements with the Local 910" – both Plaintiff's owner, Harry Dow, and Local 910 Business Manager George Intschert signed them, and the International Union later approved them. Second, the context of the letters was Plaintiff's dissatisfaction with the collective bargaining relationship and the quality of Union referrals, as evidenced by Plaintiff's complaints and an informal Labor-Management Committee meeting held at the Clearview Restaurant in Governeur, New York, prior to the July 1998 letters. *See* Wagner Aff. at Exhibit 2 at 26-31. Third, the letters evidence no confusion or ambiguity about Plaintiff's intent. Plaintiff wanted to end its relationship with both Defendant and NECA, and it attempted to do so immediately. Moreover, the letters explained Plaintiff's reasons for doing so:

> The reason for this decision is based on the bottom line of Profit/Loss.
>
> In the past Five plus years we have incurred either a break even or loss on most projects in which we have employed Union help.
>
> Most Electricians we have employed are considerable [sic] less qualified than than [sic] what we expect of Journeymen Electricians [sic]
>
> We have neither the capital nor the time to educate these people

> about responsibilities, workmanship, punctuality and all the other criteria that make up a qualified Electrician that can complete a project on time.
>
> We also feel Local 910 has not supplied Dow Electric Inc. with the special skills people that we requested on numerous occasions (Specifically Capable Supervision) [sic]

*See* Amended Complaint at Exhibits 2 and 3. Contrary to Defendant's assertions, a reasonable reading of Plaintiff's July 31, 1998 letters could not lead to the conclusion that Plaintiff merely wanted to withdraw its membership from NECA rather than terminating the entire collective bargaining relationship with both the Association and the Union.[4] Accordingly, unless subsequent correspondence voided this termination of collective bargaining authority, the 2000-2003 CBA did not bind Plaintiff.

### 2. *Subsequent Correspondence*

Following the July 31, 1998 letters, Local 910 Business Manager Intschert sent Plaintiff a letter, dated August 11, 1998, stating "that due to your untimely request Dow Electric, Inc. is bound to the collective bargaining agreements with Local 910 until March 31, 2000." *See* Amended Complaint at Exhibit 4 at 1. The parties also had oral communications between July and October of 1998. During this time, Plaintiff's counsel, Mr. Brody, met with Business Manager Intschert in Governeur, New York, to discuss the parties' relationship for the duration

---

[4] The parties do not dispute that the July 31, 1998 letters were timely. The pre-hire agreements required Plaintiff to submit written notice of its intent to withdraw the Association's collective bargaining authority 150 days prior to the pre-hire agreements' expiration on November 2, 1999. Plaintiff submitted the July 1998 letters more than one year in advance of this deadline. The earliness of the letters does not alter their effectiveness in repudiating the delegation of bargaining authority. *See Haas Elec.*, 299 F.3d at 29 n.6.

of the 1997-2000 CBA.  *See* Affidavit of Stuart Brody ("Brody Aff."), sworn to June 10, 2005, at ¶¶ 5-12; Wagner Aff. at Exhibit 2 at 32-41.  Following this meeting, Plaintiff's counsel sent Defendant a letter dated October 7, 1998:

> I thank you for the opportunity to speak with you on September 29, 1998 about our mutual goal in promoting Harry Dow's success under the collective bargaining agreement.  As I promised, we hereby withdraw Harry Dow's letter of July 31, 1998 purporting to withdraw from the Union.  We expressly disavow that intent and declare the letter void as to that purpose.  To the extent that letter may be effective in withdrawing from the National Electrical Contractors Association, it shall stand.

*See id.* at Exhibit 6.

Defendant contends that Plaintiff's October 7, 1998 letter is evidence that Plaintiff indicated that the pre-hire agreements were still in effect.  Moreover, Defendant notes that there is a difference between membership in NECA and delegation of bargaining authority, asserting that Plaintiff merely confirmed its termination of membership in NECA in the October 7, 1998 letter.

Contrary to Defendant's assertions, there is only one reasonable interpretation of the parties' subsequent communications, culminating with Plaintiff's October 7, 1998 letter: Plaintiff, having been informed that it could not withdraw from the 1997-2000 CBA, indicated that it would abide by the CBA until it expired.  However, Plaintiff's reference to withdrawing from NECA shows that it still intended to terminate its relationship with the Association, including the delegation of collective bargaining authority.  The state of the parties' relationship, specifically Plaintiff's complaints and the resulting Labor-Management Committee meeting, noted above, supports this interpretation.  Even Union Business Manager George Intschert noted

that Plaintiff's owner, Harry Dow, left this meeting unsatisfied:

> at the end he just kind of threw his hands up and told them that he was unhappy with what they told him and he kind of – I wouldn't say stormed out but wasn't happy with the response he got.

*See* Wagner Aff. at Exhibit 2 at 30.

An analogous principle of contract law also supports the conclusion that Plaintiff's October 7, 1998 letter did not nullify its earlier unequivocal termination of the Association's collective bargaining authority. A party who has anticipatorily repudiated a contract has the ability to reinstate the contract by retracting its repudiation before the aggrieved party has either acted to cancel the contract or materially changed its position. *See* N.Y. U.C.C. § 2-611 (McKinney 2002). However, like the repudiation itself, the retraction is effective only if a reasonable man in the aggrieved party's position would conclude that the repudiating party clearly and unambiguously indicated its intention to perform. *See Record Club of Am., Inc. v. United Artists Records, Inc.*, 643 F. Supp. 925, 940 n.10 (S.D.N.Y. 1986) (quotation omitted), *vacated on other grounds by* 890 F.2d 1264 (2d Cir. 1989).

In this case, the October 7, 1998 letter did not clearly and unambiguously retract Plaintiff's termination of the Association's collective bargaining authority. Although the July 31, 1998 letters unequivocally terminated the Association's collective bargaining authority by referring to the "agreements," the October 7, 1998 letter merely referred to "withdraw[al] from the Union." The October 7, 1998 letter did not attempt to reinstate the agreements. In addition, although Plaintiff sent the July 31, 1998 letters to both the Union and the Association, it only sent the October 7, 1998 to the Union, indicating that it did not intend to alter its current status

vis-a-vis the Association.[5]

The Court finds that Plaintiff did not retract its earlier termination of the Association's collective bargaining authority. Therefore, the Association could not bind Plaintiff to the 2000-2003 CBA, and the Labor-Management Committee could not adjudicate a grievance against Plaintiff based on violations of the 2000-2003 CBA. Accordingly, the Court grants Plaintiff's motion for summary judgment and denies Defendant's cross-motion for summary judgment on Plaintiff's claims and Defendant's counterclaim and vacates the Committee's $991,629.89 award based on the 2000-2003 CBA.

---

[5] Although the Court does not rely on them in reaching this decision, two other factors support the conclusion that Plaintiff intended to abide by the 1997-2000 CBA while terminating the Association's authority to bind it to a subsequent CBA. First, Plaintiff has maintained that it "ceased doing bargaining unit work" on or about May 29, 1998. However, at this time, Plaintiff has not provided evidence on this matter. Second, as the end of the 1997-2000 CBA approached, Plaintiff's counsel evidenced this intent in his letter dated March 29, 2000:

> As the contract between the Union and Dow Electric comes to an end, we wish to thank you for your cooperation over the last eighteen months. I think you'll agree that the Company has fulfilled its obligations under the contract.
>
> Nevertheless, you must also be aware that we haven't had any employees for nearly two years. Moreover, under the holding in the case of *Deklawa and Sons*, 282 NLRB 1385 and the cases interpreting it, Dow Electric is under no further obligation to bargain with the Union for, or enter into, a new collective bargaining agreement.
>
> Since we had not heard from you regarding the Union's intent with respect to a successor agreement (see Section 1.02 of the Agreement) we thought this would be the appropriate time to inform you of our decision.

*See* Amended Complaint at Exhibit 8.

**B.     The Committee's authority to hear the dispute under the 1997-2000 CBA**

The remaining issue is whether the Committee properly awarded Defendant $63,011.48 for Plaintiff's violations of the 1997-2000 CBA. Plaintiff asserts that the Committee could not issue an award based on the 1997-2000 CBA after it expired. Moreover, Plaintiff asserts that the Committee could not legally award interest and liquidated damages for violations of the CBA's fringe benefit payment requirements because the CBA did not mention such an award. Finally, Plaintiff asserts that the Committee could not legally award back pay.

### *1. Arbitration of the dispute after the 1997-2000 CBA expired*

When a dispute is based on acts that occurred before the expiration of an agreement, it can still be arbitrated notwithstanding the fact that the arbitration demand was not served until after the agreement expired. *See In re Montgomery-Otsego-Schoharie Solid Waste Mgmt. Auth.*, 215 A.D.2d 995, 996 (3d Dep't 1995) (citations omitted). Accordingly, the Court rejects Plaintiff's assertion that the Committee could not arbitrate violations of the 1997-2000 CBA after it expired.[6]

### *2. Interest and liquidated damages*

The 1997-2000 CBA incorporates the collections policies of the various fringe benefit funds:

> Section 9.10.  The Funds shall be administered pursuant to

---

[6] The Court notes that, when the Committee heard this dispute, Plaintiff stipulated that it owed fringe benefit contributions for this time period. Apparently, the parties only disputed the amount that Plaintiff owed.

>provisions of Agreements and Declarations of Trust, and rules and regulations, including collections policies, established by the various trustees and shall be in compliance with the requirements of state and federal laws governing and regulating such trusts.

*See* Wagner Aff. at Exhibit 6 at § 9.10.  In turn, the collections policy states that

>[i]f no payment has been received by the Funds on or before the thirtieth (30th) day of the month following the month during which hours are worked and for which contributions are required, the Employer will be assessed interest in the amount of delinquent contributions at the rate of eighteen percent (18%) per annum, calculated from the date the contributions were due as described in paragraph (a), plus liquidated damages equal to ten percent (10%) of the delinquent fringe benefit contributions, auditing fees, attorneys' and paralegal fees, and all costs.

*See* Affidavit of Dennis Affinati, sworn to July 25, 2005, at Exhibit 32 at 3-4.  Therefore, the Committee's award of interest and liquidated damages for delinquent fringe benefit contributions was based on the parties' agreement.  Accordingly, the Court rejects Plaintiff's assertion that the Committee could not award interest and liquidated damages pursuant to the 1997-2000 CBA.

### 3. Back pay

An arbitrator's award is entitled to "a high degree of deference," and a reviewing court should only determine "'whether the arbitrator's award draws its essence from the collective bargaining agreement, since the arbitrator is not free merely to dispense his own brand of industrial justice.'" *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Hollywood Heating & Cooling, Inc.*, 1 Fed. Appx. 30, 33 (2d Cir. Jan. 5, 2001).  Therefore, a court will uphold an award that it views as incorrect if that award merely has "'a barely colorable justification'" or is merely "'plausibly grounded' in the parties' contract." *Id.*

In this case, the 1997-2000 CBA provides that the Union will be the exclusive source of employment referrals for all of the employer's covered work and that the employer must first contact the Union for referrals before resorting to non-Union labor sources. *See* Wagner Aff. at Exhibit 6 at §§ 2.08, 4.02. It also contains extensive provisions about wages and payment of workers. Moreover, it states that the Labor-Management Committee will decide and adjust any dispute that representatives of the employer and the Union cannot settle. *See id.* at Exhibit 6 at §§ 1.05-1.09.

In reviewing Defendant's grievance against Plaintiff, the Committee found that Plaintiff violated CBA provisions designating the Union as the exclusive source of referrals. The Committee later awarded Defendant back pay to remedy these violations. The Court finds that back pay was a reasonable form of relief that was at least plausibly grounded in the CBA. The implication of the Committee's award was that Plaintiff employed electricians without using the mandated referral process. As a result, Union electricians were not employed. Therefore, an award of back pay was justified by the parties' exclusive relationship, as set forth in the 1997-2000 CBA. Accordingly, the Court rejects Plaintiff's assertion that the Committee could not award back pay.[7]

In conclusion, the Court denies Plaintiff's motion for summary judgment and grants

---

[7] Plaintiff also asserts that the Committee erred in calculating the back pay award because it based the award on the number of hours Plaintiff's employees worked during the period of the violations. However, Plaintiff provides no authority to support the assertion that the Committee could not use this method to calculate its award. Furthermore, as noted above, the Court's review of the Committee's decision is narrow. Insofar as the Committee was attempting to remedy damage to Union workers who remained unemployed as a result of Plaintiff using other sources of labor, it seems reasonable for the Committee to consider the number of hours Plaintiff's employees worked to the extent that they wrongly usurped Union employment opportunities.

Defendant's cross-motion for summary judgment on Plaintiff's claim and Defendant's counterclaim and affirms the Committee's $63,011.48 award based on the 1997-2000 CBA.

### IV. CONCLUSION

Accordingly, having reviewed the parties' submissions and heard their arguments in support of, and in opposition to, the current motions, and for the reasons stated herein, as well as at oral argument, the Court hereby

**ORDERS** that Plaintiff's motion for summary judgment is **GRANTED** and Defendant's cross-motion for summary judgment is **DENIED** on Plaintiff's claims and Defendant's counterclaim and vacates the Committee's $991,629.89 award based on the 2000-2003 CBA; and the Court further

**ORDERS** that Plaintiff's motion for summary judgment is **DENIED** and Defendant's cross-motion for summary judgment is **GRANTED** on Plaintiff's claims and Defendant's counterclaim and affirms the Committee's $63,011.48 award based on the 1997-2000 CBA; and the Court further

**ORDERS** that the Clerk of the Court enter judgment and close this case.

**IT IS SO ORDERED.**

Dated: May 29, 2007
       Syracuse, New York

                                          Frederick J. Scullin, Jr.
                                          Senior United States District Court Judge